# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

JAMONTE JAMAR FLETCHER,
*Inmate Identification No. 422-651,*

    Plaintiff,

    v.

C.O. II CHASE DYKES,
C.O. II JOSEPH TILGHMAN,
C.O. II DOMINICK TIMMONS and
WARDEN RICKY FOXWELL,

    Defendants.

Civil Action No. TDC-17-0914

## MEMORANDUM OPINION

Plaintiff Jamonte Jamar Fletcher, currently incarcerated at Eastern Correctional Institution ("ECI") in Westover, Maryland, has filed suit under 42 U.S.C. § 1983 ("§ 1983") against ECI Warden Ricky Foxwell ("the Warden") and ECI correctional officers Chase Dykes, Joseph Tilghman, and Dominick Timmons (collectively, "the Officer Defendants"). Fletcher's claims arise from a March 11, 2017 cell search by the Officer Defendants, the conditions of his subsequent confinement in ECI Cell 4C1, and the denial by prison officials of his various requests for relief. Presently pending before the Court are Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, and Fletcher's "Request for Leave to Reply to Defendants Reply to Plaintiffs Opposition to Defendants Motion to Dismiss or, in the Alternative, Motion for Summary Judgment," which the Court construes as a Motion for Leave to File a Surreply. Upon review of the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Court will deny

Fletcher's Motion for Leave to File a Surreply and grant in part and deny in part Defendants' Motion.

## BACKGROUND

### I.    March 11, 2017 Cell Search and Transfer

On March 11, 2017, Defendants Dykes and Tilghman arrived at Fletcher's cell and announced that they were going to conduct a random search for contraband.  Fletcher and his cellmate were thoroughly patted down by the officers, and the cell search revealed no contraband.  Dykes then grabbed Fletcher, stated that he would conduct a strip search, and forced Fletcher to strip down to his "shorts, boxers, and socks" and searched him a second time.  Am. Compl. at 1, ECF No. 3-1.[1]  According to Fletcher, Dykes found no contraband.  Fletcher then stated "see I do not have anything on me." *Id.*  Dykes replied that Fletcher was "making him nervous" and conducted a third search of Fletcher's body, including "grabbing [his] private parts and rubbing his hand between the crack of [his] butt." *Id.*  After this third search, Fletcher told Dykes "see now you know I don't have anything." *Id.*

The parties disagree on what happened next.  According to Fletcher, Dykes ordered Fletcher to hand him "the shorts and drop the boxers then squat and cough." *Id.*  Fletcher, positioned with his back facing Dykes, complied by handing Dykes his shorts over his shoulder, dropping his boxers to the ground, and coughing.  Dykes then grabbed him by the neck and put him in a chokehold.  Dykes, Tilghman, and Defendant Timmons, who had arrived at the cell after the search began, then "began slamming [Fletcher's] head against the lockers, bunk and floor." *Id.* at 2.

---

[1]    The page numbers for this document are the numbers assigned by the Court's CM/ECF system.

In a Notice of Inmate Rule Violation, affirmed under penalty of perjury, Dykes provided a different account of the incident. Dykes claims that Fletcher became "non-compliant" "when he was asked for his pants." Not. Inmate Rule Violation at 9, Mot. Dismiss Ex. 1, ECF No. 41-5. Timmons arrived and noticed "what appeared to be a home-made weapon hanging out of [Fletcher's] pants." *Id.* Fletcher allegedly reached for the weapon, which caused Dykes "to gain[] control of [Fletcher's] head" and give "verbal commands to comply" while "Timmons gained control of [Fletcher's] hands which caused the weapon to fall out of [Fletcher's] grasp." *Id.* The officers recovered a "home-made weapon made of metal approximately 6" in length and 2" in width sharpened to a point with a cloth wrapped handle," which was then taken to an evidence locker at the prison. *Id.*

According to Fletcher, no weapon was found. Nevertheless, the three officers then hogtied him and took him out of the cell. At some point during this transit, Fletcher was dropped on his head by the officers from a height of 2 ½ feet. According to Fletcher, he asked, "[W]hat did I do? I didn't do anything" and offered to not write up a complaint if the officers would let him return to his cell. Am. Compl. at 2. The officers replied that "[they] would but everyone on the tier already saw them handcuff and force [Fletcher] out the cell and off the tier and they have to cover their own asses." *Id.*

Fletcher states that he was then taken to an office in the prison and interrogated by the three officers, including asking him "where are the drugs and weapons?" *Id.* Fletcher claimed that he did not know what the officers were talking about and requested his glasses. Fletcher's legs were then shackled and he was walked outside in what he describes as 20 degree weather wearing only his boxers and socks. At some point during this walk, Fletcher told one of the

Officer Defendants that his "private parts are hanging out," to which the officer laughed and stated "his zipper is broken and his privates are hanging out, too." *Id.*

Fletcher was then taken to ECI's medical facility, where he told a nurse that he had been assaulted by Dykes, Tilghman, and Timmons. Nurse Tracey L. Hall noted that Fletcher was "found to have a large reddened abrasions to [his] right anterior shoulder and [a] single 3 cm scratch to his right lateral neck." 3/11/17 Med. Report at 2, Mot. Dismiss Ex. 1A, ECF No. 41-6. Nurse Hall also noted that Fletcher "was not fully cooperative with questioning" and stated that he had "no pain." *Id.*

While in the medical unit, Fletcher was questioned by Lieutenant Donald Adams. According to Fletcher, Lt. Adams refused to allow Fletcher to write a statement about the incident. An "Offender's / Detainee's Statement" form, signed by Lt. Adams, states that Fletcher "refused to write [a] statement." Statement at 2, Mot. Dismiss Ex. 1B, ECF No. 41-7. Adams then took photos of Fletcher's injuries and directed the officers to put Fletcher in an orange jumpsuit. The jumpsuit, however, covered only Fletcher's legs because the officers refused to uncuff Fletcher to allow him to put his arms through the top half of the jumpsuit.

## II.    Staff Alert Confinement

Fletcher was then taken to Cell 4C1 on ECI Housing Unit 4. Fletcher claims that while in that cell, which he describes as "the butt-naked room" lacking a light, mirror, or mattress, Am. Compl. at 3-4, he was denied clothes, forced to sleep on a concrete floor with only a thin blanket, and subjected to cold conditions from a window that would not close that caused him to put paper bags on his feet in an effort to stay warm. He further asserts that he was denied showers, given his food in wax paper bags without any utensils, and denied sanitary items such as a toothbrush and soap, which caused him to have to eat his food with his hands without washing

them after using the toilet. Fletcher states that he was moved from Cell 4C1 to 4B11 on March 17, 2017 but did not receive his first shower until March 20, 2017.

In a March 11, 2017 memorandum, Lt. Adams stated that he was putting Fletcher on "Staff Alert" status because Fletcher "attempted to retrieve a homemade weapon observed in undershorts as Ofc. C. Dykes & Ofc. J. Tilghman were conducting a strip search." 3/11/17 Mem. at 1, Mot. Dismiss Ex. 3, ECF No. 41-9. Cell 4C1 is one of the cells used for inmates on Staff Alert status, from which mirrors were removed because inmates were removing the metal from them. On March 15, 2017, Lt. Adams stated that Fletcher's behavior had improved and downgraded his status from "Staff Alert Level I to Staff Alert Level II." 3/15/17 Mem. at 2, Mot. Dismiss Ex. 3, ECF No. 41-9. Adams again downgraded Fletcher's status on March 17, 2017 and removed him from Staff Alert status completely on March 21, 2017.

According to a log of Fletcher's time on Staff Alert, which tracks Fletcher's out of cell activity, showers, and daily behavior, Fletcher was offered both recreation and a shower on March 15 and March 17, 2017, but was not ready when they were made available. The maintenance logbook for Cell 4C1 contains no repair orders for a broken window or a lack of hot water during March or April 2017.

### III. Complaints and Disciplinary Proceedings

Fletcher filed an Administrative Remedy Procedure complaint ("ARP") on March 18, 2017. In the ARP, Fletcher recounted the cell search, the alleged assault by Dykes, Tilghman, and Timmons, and the conditions of Cell 4C1. The Warden responded to Fletcher's ARP on March 27, 2017 by stating that Fletcher's "request for Administrative Remedy has been reviewed and is hereby dismissed for procedural reason[s]; this issue is being investigated by IID," referring to ECI's Intelligence & Investigative Division. ARP No. ECI-0682-17 at 1, Mot.

Dismiss Ex. 7, ECF No. 41-13. "Since this issue is being investigated by IID," the Warden continued, "no further action will be taken through the ARP process." *Id.*

Fletcher was charged with three violations of prison disciplinary rules for possession of a homemade knife. At his disciplinary hearing, a picture of the knife was introduced as evidence, but Fletcher's medical records were deemed not relevant. Although Fletcher sought to call as a witness Thomas Vito, another ECI inmate who allegedly witnessed the March 11, 2017 incident, the institutional representative reported to the Hearing Officer that Vito declined to testify. In a signed declaration, submitted by Fletcher as part of a Motion for Summary Judgment that was previously denied by the Court, Vito stated that he "never denied to participate in the in-house hearing as a witness." Vito Decl. at 1, ECF No. 31. He further stated that "[o]n two occasions an officer verbally asked me if I want to be a witness. At which both times I agreed."[2] *Id.*

The Hearing Officer found Fletcher guilty of violating rules 105 (possession of a weapon) and 400 (disobeying a direct lawful order). As punishment, Fletcher received 220 days of administrative segregation, revocation of good conduct credits of 185 days, and the suspension of visitation privileges for one year. Fletcher's appeal of this decision to the Warden was denied.

Throughout this period, Sgt. William Justice of the IID was separately investigating the March 11, 2017 incident. After interviewing Dykes, Timmons, and Fletcher, Sgt. Justice obtained a criminal summons charging Fletcher with possession of a deadly weapon. The charges resulted in a disposition of *nolle prosequi* on September 29, 2017. *See State v. Fletcher,*

---

[2]    Although Fletcher did not attach the Vito declaration as an exhibit to his Opposition to Defendants' Motion, the Court will consider the document pursuant to Federal Rule of Civil Procedure 56(c)(3).

No. D-022-CR-17-000301 (Dist. Ct. Somerset Cty. 2017), *available at* http://casesearch. courts.state.md.us/casesearch/inquiryByCaseNum.jis.[3]

## DISCUSSION

### I.     Motion for Leave to File a Surreply

As a preliminary matter, the Court addresses Fletcher's Motion for Leave to File a Surreply. This Court's Local Rules provide that surreply memoranda are not permitted unless otherwise ordered by the Court. D. Md. Local R. 105.2(a). Surreply briefs are generally disfavored in this District, *Chubb & Son v. C & C Complete Servs., LLC*, 919 F. Supp. 2d 666, 679 (D. Md. 2013), but they may be permitted "when the moving party would be unable to contest matters presented to the Court for the first time in the opposing party's reply," *TECH USA, Inc. v. Evans*, 592 F. Supp. 2d 852, 861 (D. Md. 2009).

In his Motion, Fletcher argues that (1) Defendants have failed to produce various pieces of evidence in their possession; (2) the chain of custody of the weapon allegedly found on Fletcher during the search of his cell is deficient; and (3) various aspects of his prison disciplinary proceeding violated his due process rights. None of these arguments are responsive to issues raised by Defendants for the first time in their reply memorandum. To the extent that Fletcher seeks to add new claims to his Complaint, the Motion is an improper amendment and inconsistent with the Court's May 16, 2018 Order. Accordingly, the Motion for Leave to File a Surreply is denied.

---

[3]     The Court takes judicial notice of the filings in Fletcher's criminal case. Fed. R. Evid. 201(b)(2); *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (stating that a court may take judicial notice of matters of public record.)

## II.  Motion for Summary Judgment

Although Fletcher does not identify the particular basis for his claims in the Amended Complaint, the Court construes the claims as filed pursuant to 42 U.S.C. § 1983.  Section 1983 allows plaintiffs to sue persons acting under color of the law of "any State or Territory or the District of Columbia" for violating their federal rights.  42 U.S.C. § 1983 (2012).  As relief, Fletcher seeks monetary damages of $250,000 to $500,000, as well as the criminal prosecution of the Officer Defendants for assault, battery, and planting evidence and the prosecution of Warden Foxwell for reckless endangerment.

In their Motion, Defendants characterize Fletcher's Complaint as alleging six separate claims:  (1) an Eighth Amendment excessive force claim for assaults he allegedly suffered during the March 11, 2017 cell search; (2) a due process claim for allegedly false statements made in correctional officer reports; (3) an Eighth Amendment conditions of confinement claim based on the condition of Cell 4C1; (4) a claim that he was inappropriately placed on administrative segregation; (5) violations of various prison policies and regulations; and (6) a claim that his right to participate in the ARP process were denied.

Fletcher does not challenge these characterizations, and the Court will construe the Complaint as alleging the above claims.  However, the Court will combine claims (2) and (4) into a single claim that his due process rights were violated in the disciplinary proceedings relating to the March 11, 2017 incident.  The Court will also combine claims (5) and (6) into a single claim that his rights under the ARP process were violated.

Defendants move for dismissal or summary judgment on the merits of each claim, and assert three additional defenses:  (1) Warden Foxwell is entitled to dismissal because there is no doctrine of vicarious liability (*respondeat superior*) in § 1983 cases; (2) Fletcher does not have a

right to the criminal prosecution of another; and (3) Defendants are entitled to qualified immunity. The Court will address each claim and argument in turn. Defendants' qualified immunity argument will be discussed in conjunction with the analysis of specific claims to which it may apply.

## A.    Legal Standard

Defendants have filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, to which they have attached 15 exhibits. Typically, when deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers only the complaint and any attached documents "integral to the complaint." *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Rule 12(d) requires courts to treat such a motion as a motion for summary judgment where matters outside the pleadings are considered and not excluded. Fed. R. Civ. P. 12(d). Before converting a motion to dismiss to one for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* "Reasonable opportunity" has two requirements: (1) the nonmoving party must have some indication that the court is treating the 12(b)(6) motion as a motion for summary judgment, and (2) the nonmoving party "must be afforded a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (citation omitted). Here, the notice requirement has been satisfied because the title of the Motion informed Fletcher of the possibility that the Motion could result in summary judgment. Fletcher has already requested and received a limited opportunity for discovery in advance of the resolution of the Motion, and Fletcher has attached his own exhibits to his memorandum in opposition to the Motion. Accordingly, the Court will construe the Motion as a Motion for Summary Judgment.

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

### B.    Excessive Force

Fletcher argues that Dykes' use of a chokehold, Tilghman's other assaults, and being hogtied and dropped on his head during and after the March 11, 2017 cell search constitute excessive force on the part of the Officer Defendants. The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. This prohibition "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin,* 77 F.3d 756, 761 (4th Cir. 1996). The Eighth Amendment is violated when an inmate is subjected to "unnecessary and wanton infliction of pain." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173 (1976)).   To establish an Eighth Amendment violation, an inmate must establish both that the prison official subjectively "acted with a sufficiently culpable state of mind" and that the injury or deprivation inflicted was objectively serious enough to constitute a violation. *Williams,* 77 F.3d at 761. On the subjective

element, an inmate must show that the guards used force "maliciously or sadistically for the very purpose of causing harm" rather than "in a good faith effort to maintain or restore discipline." *Hudson v. McMillian,* 503 U.S. 1, 6 (1992) (quoting *Whitley v. Albers,* 475 U.S. 312, 320–21 (1986)).  In assessing this element, a court should consider "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of any reasonably perceived threat;" and "(4) any efforts made to temper the severity of a forceful response." *Iko v. Shreve,* 535 F.3d 225, 239 (4th Cir. 2008) (quoting *Whitley,* 475 U.S. at 321).

As for the objective level of harm, a party asserting an Eighth Amendment excessive force claim must demonstrate that the officer used a "nontrivial" amount of force. *Wilkins v. Gaddy,* 559 U.S. 34, 39 (2010).  "[N]ot every malevolent touch by a prison guard gives rise to a federal cause of action." *Id.* at 37 (quoting *Hudson,* 503 U.S. at 9).  Although inmates must show the application of nontrivial force, an Eighth Amendment violation can occur even if that force did not cause serious injury. *Id.* at 38 ("[A]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury.").  "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Hudson,* 503 U.S. at 9.  The extent to which injuries are modest is accounted for in the award of damages. *See Wilkins,* 559 U.S. at 40.

Although Defendants have provided statements, given during the IID investigation, attesting to their recovery of a weapon from Fletcher during the cell search, where Fletcher has consistently stated in all of his filings that he did not have a weapon on March 11, 2017, they have at most create a genuine issue of material fact on that point.  As for whether Defendants

used excessive force, they have not provided sworn statements directly addressing those allegations, particularly Fletcher's claims that he was placed in a chokehold, hogtied, and dropped on his head. Although the photographs of Fletcher taken immediately after the incident do not appear to show any visible injuries, and Fletcher told Nurse Hall that he was not in pain, these facts does not necessarily negate Fletcher's factual allegations, because serious injuries are not necessary to succeed on an Eighth Amendment excessive force claim. *See Wilkins*, 559 U.S. at 38. Therefore, the issue requires credibility determinations not appropriate for resolution on summary judgment. *See Anderson,* 477 U.S. at 255.

Nor are Defendants entitled to qualified immunity on this claim, at least based on the record before the Court. Government officials sued in their individual capacity may invoke qualified immunity. *Bland v. Roberts,* 730 F.3d 368, 391 (4th Cir. 2013). "Qualified immunity protects government officials from civil damages in a § 1983 action insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* (quoting *Edwards v. City of Goldsboro,* 178 F.3d 231, 250 (4th Cir. 1999)). To overcome a claim of qualified immunity from a § 1983 claim, there must be a showing that (1) the government official violated a federally protected right of the plaintiff; and (2) that right was clearly established at the time of the alleged misconduct, in that a "reasonable official would understand that what he is doing violates that right." *Id.* If the Court determines that the government official took actions that a reasonable officer could have believed were lawful, then the official is entitled to dismissal before discovery. *Id.*

As discussed above, there remains a genuine issue of material fact whether, as Fletcher alleges, the Officer Defendants entered Fletcher's cell on March 11, 2017 and assaulted him without justification, including placing him in a chokehold and dropping him on his head after he

12

was hogtied. Such actions, if proven, would violate Fletcher's clearly established right to be free from the malicious or sadistic use of harm by correctional officers. *See, e.g., Hudson*, 503 U.S. at 9. Accordingly, summary judgment on Fletcher's excessive force claim based on qualified immunity is not warranted at this time.

Because there are genuine issues of material fact relating to the incident on March 11, 2017, the Court will deny the Motion for Summary Judgment as to the excessive force claim.

### C.    Conditions of Confinement

Fletcher also challenges the conditions of his confinement in Cell 4C1 from March 11, 2017 to March 17, 2017. The Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned." *Iko*, 535 F.3d at 238 (quoting *Williams*, 77 F.3d at 761). Conditions of confinement that "involve wanton and unnecessary infliction of pain," or which "deprive inmates of the minimal civilized measure of life's necessities," may amount to cruel and unusual punishment. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). However, conditions that are merely restrictive or even harsh "are part of the penalty that criminal offenders pay for their offenses against society." *Id.* In order to establish the imposition of cruel and unusual punishment in conditions of confinement, a prisoner must prove two elements: that "'the deprivation of [a] basic human need was *objectively* sufficiently serious,' and that *subjectively* the officials act[ed] with a sufficiently culpable state of mind.'" *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (citation omitted). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called 'punishment,' and absent severity, such punishment cannot be called 'cruel and unusual.'" *Iko*, 535 F.3d at 238 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298–300 (1991)).

The objective prong of a conditions of confinement claim requires the prisoner to "'produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions,' or demonstrate a substantial risk of such serious harm resulting from the prisoner's unwilling exposure to the challenged conditions." *Shakka*, 71 F.3d at 166 (quoting *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993)). Thus, "a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year" violates the Eighth Amendment, even if "the complaining inmate shows no serious current symptoms." *Helling v. McKinney*, 509 U.S. 25, 33–34 (1993); *Webb v. Deboo*, 423 F. App'x 299, 300 (4th Cir. 2011). To establish a sufficiently culpable state of mind, there must be evidence of deliberate indifference, in that a known excessive risk of harm to the inmate's health or safety was disregarded. *See Wilson v. Seiter*, 501 U.S. 294, 302–03 (1991) (applying the deliberate indifference standard to conditions of confinement claims). "[T]he test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." *Brown v. N.C. Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)).

In response to a court order, Defendants filed photographs of Cell 4C1 taken on March 1, 2018. The photos show a toilet, sink, and window, but no mattress or mirror. Although these pictures were taken nearly a year after the incident, Fletcher does not dispute that these photos accurately depict the condition of Cell 4C1 on March 11, 2017. While Defendants have provided records supporting their claim that no work maintenance requests were submitted during Fletcher's time in Cell 4C1 and that he was offered opportunities for recreation and showers, they have not offered any evidence that Fletcher was provided with clothing, hygiene materials, or a mattress. Nor have Defendants specifically refuted Fletcher's claim that the cell

window was broken and that he was exposed to approximately 20-degree weather for six nights with only a "thin blanket" to keep warm. Am. Compl. at 7.

On this record, the Court finds that summary judgment is not presently appropriate on this claim. Most importantly, Fletcher has alleged a deprivation of an identifiable human need— warmth—as a result of being housed almost naked in a cell with an allegedly broken window under cold weather conditions, combined with a failure by prison staff to alleviate this condition by fixing the window and issuing Fletcher clothing or an adequate blanket. *See Wilson*, 501 U.S. at 304 ("Some conditions of confinement may establish an Eighth Amendment violation "in combination" when each would not do so alone . . . for example, a low cell temperature at night combined with a failure to issue blankets.")

Moreover, Fletcher's allegation of a failure to issue eating utensils and sanitary items such as soap, which forced Fletcher to eat food with his unwashed hands after using the toilet, could raise hygiene concerns that implicate the Eighth Amendment and thus warrants additional factual development. *See Helling v. McKinney*, 509 U.S. 25, 33 (1993) (holding that prison officials may not "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering" under the Eighth Amendment); *cf. McBride v. Deer*, 240 F.3d 1287, 1292 (10th Cir. 2001) ("Not surprisingly, human waste has been considered particularly offensive so that courts have been especially cautious about condoning conditions that include an inmate's proximity to it.").

While Fletcher does not describe any injury as a result of his confinement in detail, he does state that he seeks relief for his "pain and suffering . . . [f]or the seven days [he] was cold and stinking in that dirty butt naked room at 4C1." Am. Compl. at 8. Where Defendants have not offered sufficient facts to complete the record on these issues, additional factual development

is necessary to assess the conditions of Cell 4C1, including whether the window was in fact open and the temperatures to which Fletcher was exposed, whether he was deprived of clothing and soap, and whether prison officials were aware of Fletcher's lack of warmth and potentially unsanitary conditions.

For these same reasons, Defendants are not entitled to qualified immunity on this claim. Prisoners have a clearly established right to avoid being intentionally subjected to cold temperatures. *See, e.g., Wilson*, 501 U.S. at 304; *Gaston v. Coughlin*, 249 F.3d 156, 164-65 (2d Cir. 2001); *Del Raine v. Williford*, 32 F.3d 1024, 1033-34 (7th Cir. 1994); *see also McCray v. Burrell*, 516 F.2d 357, 365-66, 368 (4th Cir. 1975) (noting that a prisoner who was kept naked in a cell that was so cold that the prisoner ripped open a mattress and slept inside it to keep warm "came perilously close to a denial of Eighth Amendment rights" but required additional factual development on the actual temperature of the cell). Under Fletcher's version of events, which the Court must accept at this stage, reasonable correctional personnel could not have believed that placing a prisoner for up to a week in a cell with a broken window in cold weather conditions and providing him no clothes, no mattress, and a "thin blanket" was lawful. *See id.*

Therefore, the Court finds that Fletcher has asserted a viable conditions of confinement claim. However, there is no allegation that any of the Defendants were aware of the conditions in Cell 4C1. Because Fletcher has not stated a claim against any current Defendant, the Court will grant the Motion as to Fletcher's conditions of confinement claim and dismiss the claim as to Defendants, but grant Fletcher leave to file an amended complaint that name additional Defendants who are allegedly responsible for the conditions Cell 4C1 endured by Fletcher.

### D.     Due Process

Construed liberally, Fletcher claims that his due process rights were violated by false statements made by Defendants and other personnel that were used in the prison administrative proceeding which resulted in "220 days on lock-up, a year loss of visits and 185 days loss of good days." Compl. at 4-7. Fletcher claims that he was denied the right to call witnesses in his defense at the April 4, 2017 hearing when the institutional representative falsely reported that inmate Thomas Vito refused to testify on his behalf. Fletcher cites to *Wolff v. McDonnell*, 418 U.S. 539 (1974), which held that inmates have a right to certain procedural due process protections in prison disciplinary proceedings, including the right to notice of a hearing, the right to present evidence and call witnesses at a hearing, and a written statement of the reasons for a decision. *Id.* at 563-66. More broadly, Fletcher argues that he was the victim of perjured testimony at the hearing, which also deprived him of his due process rights.

### 1.     Disciplinary Segregation

To the extent that Fletcher's claim alleges a due process violation leading to his disciplinary segregation, it necessarily fails. Prisoners have a liberty interest under the Fourteenth Amendment in avoiding confinement conditions that impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *see also Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). In *Sandin*, an inmate who was sentenced to 30 days of disciplinary segregation, served that time, then had the disciplinary decision overturned on appeal, filed a due process claim under 42 U.S.C. § 1983. *Id.* at 476. The Court held that the disciplinary segregation, which did not affect the duration of the prison sentence, did not present the type of deprivation that implicates a constitutional liberty interest giving rise to due process rights. *Id.* at 486. Likewise, the United States Court of

Appeals for the Fourth Circuit has held that inmates have no liberty interest in avoiding, and thus no due process claim stemming from, placement in administrative segregation. *Beverati v. Smith*, 120 F.3d 500, 502-04 (4th Cir. 1997) (rejecting a due process claim by inmates held in administrative segregation for six months after disciplinary charges were resolved). The court so held even though the actual conditions in segregation were markedly "more burdensome than those imposed on the general prison population," because those conditions were "not so atypical" that they "imposed a significant hardship in relation to the ordinary incidents of prison life." *Id.* at 504 (noting the inmates' claims that segregation included vermin-infested cells, human waste in cells, leaking toilets, unbearable heat, less food, reduced access to clean clothes and linens, reduced out-of-cell time, no outdoor recreation time, and no educational or religious services). Thus, a due process claim relating to placement in disciplinary segregation can succeed only if the prisoner can show "(1) denial of an 'interest that can arise either from the Constitution itself or from state laws or policies' and that (2) 'this denial imposed on him an atypical and significant hardship . . . in relation to the ordinary incidents of prison life.'" *Prieto v. Clarke*, 780 F.3d 245, 251 (4th Cir. 2015) (quoting *Lovelace v. Lee*, 472 F.3d 174, 202 (4th Cir. 2006)).

Here, while Fletcher has offered evidence on the conditions of his confinement in Cell 4C1 before his disciplinary hearing, he has neither argued for nor offered evidence to support a finding that the conditions during his post-hearing period of disciplinary segregation went beyond those of *Sandin* or *Beverati* to meet the requirement of atypical and significant hardship. The Court therefore finds no due process violation arising from Fletcher's placement in disciplinary segregation.

### 2. Visitation

Likewise, Fletcher's loss of visitation privileges did not implicate a constitutionally protected liberty interest. *See Williams v. Ozmint*, 716 F.3d 801, 807–08 n.9 (4th Cir. 2013) (holding, in the context of a qualified immunity analysis, that a two-year suspension of an inmate's visitation privileges did not violate a clearly established constitutional right); *White v. Keller*, 438 F. Supp. 110, 120 (D. Md. 1977), *aff'd per curiam* 588 F.2d 913 (4th Cir. 1978) (holding that there is no constitutional right to prison visitation privileges giving rise to procedural due process protections). Accordingly, the Court will grant the Motion as to Fletcher's due process claims arising from his loss of visitation privileges.

### 3. Good Conduct Credits

The Court does, however, find that Fletcher has stated a viable due process claim relating to his loss of good conduct credits. In *Wolff*, the Supreme Court held that where an inmate faces the possible loss of diminution or good time credits, the inmate is entitled to certain due process protections, including the right to a hearing at which the inmate may call witnesses and present evidence, so long as doing so is not "unduly hazardous to institutional safety or correctional goals." *Wolff*, 418 U.S. at 563-66; *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 454 (1985). If these procedural protections are provided, due process requires only that "some evidence supports the decision by the prison disciplinary board to revoke good time credits." *Hill*, 472 U.S. at 455. This standard is met if "there was some evidence from which the conclusion of the administrative tribunal could be deduced." *Id.* (quoting *United States ex rel. Vajtauer v. Comm'r of Immigration*, 273 U.S. 103, 106 (1927)). Federal courts do not review the correctness of a disciplinary hearing officer's findings of fact. *See Kelly v. Cooper*, 502 F. Supp. 1371, 1376 (E.D. Va. 1980).

The record shows that the Hearing Officer relied on the statements of the institutional representative as well as the Notice of Inmate Rule Violation completed by Dykes in which he asserted that the search of Fletcher on March 11, 2017 revealed a weapon. Therefore, where the Hearing Officer relied on "some evidence," the Court will not conduct a *de novo* review of that determination. *See Martinez v. Young*, 653 F. App'x 835, 836 (5th Cir. 2016) (noting that a federal court "need not undertake a *de novo* review of a [prison's] findings of fact"). Accordingly, Fletcher's claims that Defendants made false statements in reports relied upon during the disciplinary proceedings cannot succeed. *See Hill*, 472 U.S. at 455 (holding that assessing whether a disciplinary hearing comported with due process "does not require "independent assessment of the credibility of witnesses"); *Kelly*, 502 F Supp. at 1376; *see also Keaton v. Vance*, 56 F.3d 1385, at *2 (5th Cir. 1995) (unpublished) (rejecting a prisoner's claim that prison officials had lied during his disciplinary hearing because the prisoner's contention "was directly controverted by the [prison officials]" in their testimony and therefore "there was 'some evidence' to support the disciplinary action").

However, Fletcher's claim relating to the failure to allow him to call a witness may proceed. The right to call witnesses may be qualified in that a prison may refuse to allow witnesses where there may be a risk of reprisal or the undermining of authority. *Wolff*, 418 U.S. at 566. For example, the Fourth Circuit has upheld a prison policy that limited inmates in high security facilities to presenting other inmate witnesses through written rather than live testimony, for security reasons. *Brown v. Braxton*, 373 F.3d 501, 504, 506-07 (4th Cir. 2004). In contrast, a policy that denies all inmates the right to call any witness who will not appear voluntarily was invalidated as effectively eviscerating the right to call witnesses. *See Dalton v. Hutto*, 713 F.2d 75, 78 (4th Cir. 1983).

Here, Fletcher has alleged that he was denied the right to call Vito as a witness because the institutional representative falsely informed the Hearing Officer that Vito had declined to testify. Rather than invoking a particular policy or security reason as justification for the exclusion of Vito, Defendants assert simply that the institutional representative accurately reported Vito's status. Fletcher, however, has presented an affidavit from Vito stating that he never refused to testify. If the institutional representative had suppressed Vito's testimony by falsely claiming that Vito would not testify, Fletcher would likely have a viable due process claim arising from the denial of his right to call witnesses. Because there is a genuine issue of material fact on whether such a denial occurred, Fletcher is entitled to continue to pursue the claim.

As with his conditions of confinement claim, however, Fletcher does not allege that any of the named Defendants was responsible for the alleged violation of his due process rights. There is no allegation that the Warden or any other Defendant directed the institutional representative to falsify Vito's refusal. Accordingly, the Court will grant the Motion as to the due process claim arising from Fletcher's loss of good conduct credits and dismiss that claim as to Defendants, but grant Fletcher leave to file an amended complaint that names additional Defendants who are allegedly responsible for a denial of the right to call witnesses.

### E. ARP Procedures

Construed liberally, Fletcher alleges that his ARP was referred to IID in order to "sweep it under the rug," which violated his rights to have his ARP properly adjudicated. Am. Compl. at 6. "[I]nmates have no constitutional entitlement or due process interest in access to a grievance procedure." *Booker v. S. Carolina Dep't of Corrections*, 855 F.3d 533, 541 (4th Cir. 2017). Because prisons do not create a liberty interest protected by the Due Process Clause when they

adopt administrative mechanisms for hearing and deciding inmate complaints, the failure to abide by those administrative mechanisms does not create a constitutional claim. *See Ewell v. Murray*, 11 F.3d 482, 487–88 (4th Cir. 1993); *see also Robinson v. Wexford*, No. ELH-17-1467, 2017 WL 4838785, at *3 (D. Md. Oct. 26, 2017) ("[E]ven assuming, *arguendo*, that defendants . . . did not satisfactorily investigate or respond to plaintiff's administrative grievances, no underlying constitutional claim has been stated."); *Ireland v. Morgan*, No. WDQ-10-1943, 2012 WL 503820, at *7 (D. Md. Feb. 14, 2012). Therefore, even if prison officials did not satisfactorily investigate or respond to Fletcher's ARP, his claim fails as he has not demonstrated any constitutional injury. Likewise, Fletcher's claims of violations of various other prison regulations do not assert constitutional injuries that can be addressed under § 1983. *See Sandin*, 515 U.S. at 481-84 (noting that prison regulations are "primarily designed to guide correctional officials in the administration of a prison," not "to confer rights on inmates," and that the liberty interests arising from prison regulations are limited to freedom from punishment that exceeds the sentence or conditions that impose "atypical and significant hardship" beyond "the ordinary incidents of prison life").

Furthermore, Fletcher does not offer any credible evidence that ECI officials mishandled his ARP. The ARP was in fact referred to IID for investigation, and the IID investigator interviewed Fletcher, Dykes, and Timmons as well as collected relevant documentary evidence from the March 11, 2017 incident. Rather than "sweep the issue under the rug," it appears that ECI officials devoted significant resources to investigate the March 11, 2017 incident. Accordingly, the Court shall grant the Motion as to Fletcher's claims arising from the handling of his ARP.

## F.    Warden Foxwell

Defendants argue that Warden Foxwell is entitled to dismissal because he can be held personally liable only for his own wrongdoing or supervisory actions that are themselves unconstitutional. The doctrine of vicarious liability does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (stating that there is no *respondeat superior* liability under § 1983). In a § 1983 suit, liability of supervisory officials is "premised on a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Baynard v. Malone,* 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter,* 737 F.2d 368, 372 (4th Cir. 1984)). Thus, to establish supervisory liability under § 1983, a plaintiff must show (1) that the supervisor had actual or constructive knowledge that a subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to individuals such as the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference or tacit authorization of the alleged offensive practice; and (3) that there was a causal link between the supervisor's inaction and the constitutional injury suffered by the plaintiff. *Baynard,* 268 F.3d at 235.

Fletcher first notified the Warden's office of the March 11, 2017 incident and the conditions of Cell 4C1 through his ARP, which was filed on March 18, 2017 and received by the Warden's office on March 20, 2017, after his period of Staff Alert confinement was completed. *See* ARP No. ECI-0682-17. Fletcher does not allege that the Warden was aware that the Officer Defendants intended to assault him during the March 11, 2017 cell search, or that he was aware of the conditions in Cell 4C1 during Fletcher's confinement. Nor is the Warden alleged to have been aware of any attempt to prevent Vito from testifying at the April 4 Hearing. With the

impending dismissal of the allegations relating to the ARP process, Fletcher has offered no facts establishing any personal involvement by the Warden in the events relating to any remaining claims. Accordingly, the claims against Warden Foxwell will be dismissed.

### G. Criminal Prosecution

Finally, to the extent that Fletcher's request that Defendants be subjected to criminal prosecution can be deemed an additional claim, it must be dismissed. Fletcher, a private citizen, lacks a judicially cognizable interest in the criminal prosecution or non-prosecution of another. *See Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973); *Otero v. United States Attorney General*, 832 F.2d 141 (11th Cir. 1987). He is therefore not entitled to this type of relief.

### CONCLUSION

For the foregoing reasons, Fletcher's Motion for Leave to File a Surreply, is DENIED, and Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, is GRANTED IN PART and DENIED IN PART. The Motion is denied as to Fletcher's claims of excessive force by the Officer Defendants and granted in all other respects. The Court finds that Fletcher has stated a viable Eighth Amendment claim arising from his conditions of confinement in Cell 4C1 and a viable procedural due process claim arising from the loss of his good conduct credits. The Court shall grant Fletcher leave to amend the Complaint to name Defendants as to each of those claims. Defendant Warden Foxwell is dismissed as a defendant in this case.

The Officer Defendants shall be ordered to file an Answer to Fletcher's remaining claims. Because the case will now move into discovery, Fletcher will need counsel in order adequately to advance his case. The Court will therefore appoint counsel to represent Fletcher in this matter. A separate order shall issue.


Date: August 9, 2018

THEODORE D. CHUANG
United States District Judge